**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DEER MOUNTAIN INN LLC, Individually and on Behalf
of All Others Similarly Situated,

                                  Plaintiff,

v.

UNION INSURANCE COMPANY,

                                  Defendant.

1:20-cv-0984 (BKS/DJS)

**Appearances:**

*For Plaintiff:*
James E. Cecchi
Lindsey H. Taylor
Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.
5 Becker Farm Road, 2nd Floor
Roseland, New Jersey 07068

Christopher A. Seeger
Stephen A. Weiss
Seeger Weiss LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660

Samuel H. Rudman
Mark S. Reich
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747

Paul J. Geller
Stuart A. Davidson
Robbins Geller Rudman & Dowd LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432

*For Defendant:*
Antonia B. Ianniello
Lisa M. Southerland
Steptoe & Johnson LLP

1330 Connecticut Avenue, NW
Washington, DC 20036

Jonathan M. Bernstein
Goldberg Segalla LLP
8 Southwoods Boulevard, Suite 300
Albany, New York 12211

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Deer Mountain Inn LLC, on behalf of itself and a putative multi-state class and New York sub-class of similarly situated businesses, brings this action[1] against Defendant Union Insurance Company seeking damages and declaratory relief in connection with Defendant's denial of insurance coverage for certain of Plaintiff's business losses associated with the COVID-19 pandemic. (Dkt. No. 1). Presently before the Court is Defendant's motion to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 20). Plaintiff has opposed Defendant's motion, (Dkt. No. 33), and Defendant has replied, (Dkt. No. 37). Both parties have also filed multiple notices of supplemental authority in support of their respective positions. (Dkt. Nos. 38, 41, 44, 47, 51, 52, 55, 57). The Court heard oral argument on the motion on May 24, 2021. For the reasons that follow, Defendant's motion is granted.

## II. FACTS[2]

Plaintiff operates the Deer Mountain Inn, a country inn and restaurant located in Tannersville, New York. (Dkt. No. 1, ¶ 14). Like many businesses in New York and across the

---

[1] The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), because at least one member of the putative class is a citizen of a different state from that of Defendant and the amount in controversy exceeds $5,000,000. (Dkt. No. 1, ¶¶ 12, 14, 16).

[2] The facts are drawn from Plaintiff's Complaint, (Dkt. No. 1), as well as documents incorporated by reference in or integral to the Complaint and documents of which the Court may take judicial notice. *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 781 n.1 (2d Cir. 2019) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422, 429 (2d Cir. 2011)).

country, Plaintiff has been impacted by the global pandemic caused by COVID-19, a highly contagious coronavirus that was discovered in China in December 2019 and has since spread across the world, infecting millions of people in the U.S. and globally. (*Id.* ¶¶ 18-21). COVID-19 causes no symptoms at all in some patients, while in others it causes symptoms with a range of severity, including pneumonia, fever, cough, dyspnea, bilateral infiltrates on chest imaging, severe respiratory failure requiring ventilation and support in an intensive care unit, and death. (*Id.* ¶ 22). COVID-19 can be transmitted from human-to-human "through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission" of infectious droplets, and can also be transmitted to humans who touch contaminated surfaces or objects. (*Id.* ¶¶ 23-29). COVID-19 has an incubation period of up to 14 days, during which infected people can transmit the virus regardless of whether they have any symptoms. (*Id.* ¶¶ 24-25).

In order to curb the spread of COVID-19 through human-to-human and surface-to-human transmission, civil authorities around the country have issued orders temporarily closing or restricting the operations of a broad range of businesses (the "Closure Orders"). (*Id.* ¶¶ 30-31). Plaintiff's complaint does not describe or attach the specific closure orders that impacted its own business in New York. However, in connection with its motion, Defendant submitted copies of Executive Order No. 202.8 issued by New York Governor Andrew Cuomo on March 20, 2020 (the "New York Closure Order"), with accompanying guidance published on the New York State government's website. (Dkt. Nos. 20-9, 20-10). Plaintiff has not contested the accuracy of these documents, nor has it pointed to any other specific Closure Orders that allegedly caused its

---

The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

losses.[3] As relevant to Plaintiff, the New York Closure Order requires "[a]ll businesses and not-for-profit entities in the state" to "reduce the in-person workforce at any work locations by 100%," but specifically exempts "[a]ny essential business or entity providing essential services or functions" from this requirement. (Dkt. No. 20-9, at 3). The guidance on the state website specifically defines "essential business" to include "restaurants [and] bars (but only for take-out/delivery)," as well as "hotels, and places of accommodation." (Dkt. No. 20-10, at 4). Thus, on its face, the New York Closure Order allowed Plaintiff's hotel business to remain open and permitted Plaintiff's restaurant business to operate take-out and delivery services at its premises, but forbade it from offering in-person dining.[4]

At the time of the New York Closure Order, Plaintiff was insured by Policy Number CPA 5100237-16 issued by Defendant for the policy period of June 6, 2019 through June 6, 2020 (the "Policy"). (Dkt. No. 1, ¶ 17).[5] The Policy, which is a "standard form[] that [is] used by [Defendant] for all insureds having applicable coverage," is an "'all-risk' commercial property polic[y] which cover[s] loss or damage to the covered premises resulting from all risks other than those expressly excluded." (Id. ¶¶ 32-33). Plaintiff alleges that the Policy (as well as similar

---

[3] The Court may take judicial notice of the New York Closure Order and accompanying guidance issued by the New York Governor's office. *Nunez v. Cuomo*, No. 11-cv-3457, 2012 WL 3241260, at *16, 2012 U.S. Dist. LEXIS 110867, at *48-50 (E.D.N.Y. Aug. 7, 2012) (considering executive orders on a motion to dismiss).

[4] The complaint alleges that Plaintiff's business "had to cease operations" as a result of the Closure Orders. (Dkt. No. 1 ¶ 15). The complaint does not make clear whether Plaintiff's business actually ceased operations entirely (including both its restaurant and hotel business), or whether it only stopped offering in-person dining services at its restaurant business (which is all that the plain terms of the New York Closure Order required). In Plaintiff's opposition brief, Plaintiff clarifies that its "business was limited to take-out or delivery food service," but does not mention its hotel business. (Dkt. No. 33, at 6). At oral argument, Plaintiff's counsel represented that he did not know the extent to which the New York Closure Order required Plaintiff to curtail its hotel operations. In any event, the question of whether or not Plaintiff ceased its business operations entirely for any period of time is immaterial to the Court's decision regarding insurance coverage.

[5] Plaintiff did not attach a copy of the Policy to its complaint, but the complaint references and relies on the terms of the Policy throughout. (Id. ¶¶ 32-44, 67-114). Defendant submitted a copy of the Policy in connection with its motion, (Dkt. No. 20-2), and Plaintiff has not contested the accuracy or completeness of that copy. The Court may consider the Policy in connection with Defendant's motion, as it is incorporated by reference in and integral to Plaintiff's complaint. *Velarde*, 914 F.3d at 781 n.1.

policies Defendant has issued to other businesses in New York and around the country) provides

coverage for business losses incurred as a result of the Closure Orders, including those issued in

New York.

Plaintiff claims coverage under the Policy's business income insurance provision (the

"Business Income Provision"), which provides, in relevant part:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". [sic] The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from of a Covered Cause of Loss.

(*Id.* ¶ 35; Dkt. No. 20-2, at 136). "Business Income" is defined as the "Net Income (Net Profit or

Loss before income taxes), that would have been earned or incurred" and any "[c]ontinuing

normal operating expenses incurred, including payroll." (Dkt. No. 1, ¶ 36; Dkt. No. 20-2, at 136).

Plaintiff also claims coverage under the Policy's extra expense insurance provision (the "Extra

Expense Provision"), which provides, in relevant part:

> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

> We will pay Extra Expense (other than the expense to repair or replace property) to:

> (1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

> (2) Minimize the "suspension" of business if you cannot continue "operations". [sic]

> We will also pay Extra Expense to repair or replace any property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

(Dkt. No. 1, ¶ 37; Dkt. No. 20-2, at 136-37). Finally, Plaintiff claims coverage under the Policy's

civil authority coverage provision (the "Civil Authority Provision"), which provides, in relevant

part:

> When a Covered Cause of Loss causes damage to property other than property at the
> described premises, we will pay for the actual loss of Business Income you sustain and
> necessary Extra Expense caused by action of civil authority that prohibits access to the
> described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by
>     civil authority as a result of the damage, and the described premises are within that
>     area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions
>     resulting from the damage or continuation of the Covered Cause of Loss that caused
>     the damage, or the action is taken to enable a civil authority to have unimpeded
>     access to the damaged property.

(Dkt. No. 1, ¶ 38; Dkt. No. 20-2, at 137).

For purposes of the foregoing provisions, "Covered Cause of Loss" is defined as "direct

physical loss unless the loss is excluded or limited in this policy." (Dkt. No. 20-2, at 156). The

"period of restoration" begins "72 hours after the time of direct physical loss or damage" for

purposes of the Business Income Provision and "[i]mmediately after the time of direct physical

loss or damage" for purposes of the Extra Expense Provision, and ends at the earlier of the "date

when the property at the described premises should be repaired, rebuilt or replaced with

reasonable speed and similar quality" or the "date when business is resumed at a new permanent

location." (Dkt. No. 20-2, at 144).

The Policy also contains an endorsement entitled "Exclusion of Loss Due to Virus or

Bacteria," (the "Virus Exclusion"). The Virus Exclusion provides, in relevant part:

> The exclusion . . . applies to all coverage under all forms and endorsements that comprise
> this Coverage Part, including but not limited to forms or endorsements that cover
> property damage to buildings or personal property and forms or endorsements that cover
> business income, extra expense or action of civil authority.

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease . . .
>
> The terms of the [Virus Exclusion], or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part.

(Dkt. No. 1, ¶ 42; Dkt. No. 20-2, at 153). Plaintiff alleges that the Virus Exclusion is inapplicable because Plaintiff's (and the other class members') losses were not caused by COVID-19 itself, but by the Closure Orders, which were issued by civil authorities "to prevent the spread of COVID-19 in the future, not because coronavirus was found in or on Plaintiffs' [sic] insured property." (Dkt. No. 1, ¶ 43).[6]

Plaintiff alleges that Defendant "does not intend to cover losses caused by the Closure Orders as part of" the Policy, and that Defendant

> has denied similar claims by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also by: (a) the Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an [Economic Injury Disaster Loan]; and (b) America's [Small Business Development Center], whose COVID-19 newsletter expressly states, "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."

(Dkt. No. 1, ¶ 46).[7]  On behalf of itself and a putative multi-state class and New York sub-class of other businesses insured by Defendant,[8] Plaintiff brings anticipatory breach of contract claims

---

[6] The Policy contains several other exclusions which Plaintiff does not discuss in its complaint, but which Defendant contends preclude coverage. (Dkt. No. 20-13, at 30). For the reasons discussed in Section IV.D *infra*, the Court finds that it does not need to address the applicability of these exclusions.

[7] Plaintiff concedes that it "did not submit a claim for its business losses because it was advised by its insurance broker that submitting a claim was a waste of time because all Closure Order-related claims were routinely being rejected by insurers." (*Id.* ¶ 44). Defendant does not contest Plaintiff's allegation that it would have denied any claim Plaintiff submitted, contend that no actual case or controversy exists under Article III of the U.S. Constitution, or otherwise seek dismissal of Plaintiff's complaint on this ground.

[8] Plaintiff's proposed "Multi-State Class" is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Union to insure property in New York, Rhode Island Connecticut, Maine, Massachusetts, New Hampshire and

seeking damages for Defendant's denial of coverage under the Business Income Provision

(Count II), the Extra Expense Provision (Count IV), and the Civil Authority Provision (Count

VI). (*Id.* ¶¶ 74-83, 91-99, 107-114). Plaintiff also brings claims for declaratory relief with respect

to each of those provisions (Counts I, III and V), asking this Court to issue declarations that that:

> Plaintiffs' and the other Class Members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies;

> [Defendant] is obligated to pay Plaintiffs and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders;

> Plaintiffs' and other Class Members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies;

> [Defendant] is obligated to pay Plaintiff and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders;

> Plaintiffs' and other Class Members' Civil Authority losses incurred in connection with the Closure Orders are insured losses under their Policies; and

> [Defendant] is obligated to pay Plaintiff and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from those Orders.

(*Id.* ¶¶ 67-73, 84-90, 100-06).

---

> Vermont[,] where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

Plaintiff's proposed New York Sub-Class is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Union to insure property in New York, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

(Dkt. No. 1, ¶ 50).

## III.    STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at \*2, 2017 U.S. Dist. LEXIS 155140, at \*5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.    DISCUSSION

### A.    Law Applicable to Insurance Policy Interpretation

Under New York law,[9] courts interpret insurance policies like any other contract, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 334 (2013), giving unambiguous provisions of a policy their "plain and ordinary meaning," *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). Ambiguity, where found, must be resolved in favor of the insured. *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257-58 (2016). A policy is ambiguous if the language "could suggest

---

[9] The parties here appear to agree that New York law applies. This shared premise is "sufficient to establish the applicable choice of law." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001); *see also Krumme v. WestPoint Sevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (parties' assumption that New York law controls is sufficient to establish choice of law).

'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'" *Int'l Multifoods Corp. v. Commercial Union Ins.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)); *see also In re Viking Pump, Inc.*, 27 N.Y.3d at 258 ("[A] contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.") (alteration in original) (internal quotation marks omitted).

The policyholder bears the initial burden of showing that the insurance contract covers the loss. *Roundabout Theatre Co., Inc. v. Continental Cas. Co.*, 751 N.Y.S.2d 4, 7 (1st Dep't. 2002); *Morgan Stanley Grp., Inc.*, 225 F.3d at 276; *Int'l Multifoods Corp.*, 309 F.3d at 83 (describing an insured's "relatively light" burden of demonstrating coverage under an all-risk policy). "Labeling the policy as 'all-risk' does not relieve the insured of its initial burden of demonstrating a covered loss under the terms of the policy." *Roundabout,* 751 N.Y.S.2d at 7. Once an insured demonstrates that their loss is covered, the insurer has the burden of showing that an exclusion applies. *Pro's Choice Beauty Care, Inc. v. Great Northern Ins. Co.*, 140 N.Y.S.3d 544, 546 (2d Dep't 2021). If coverage is not barred by an exclusion, then the insured bears the burden of proving damages. *See Alpha Auto Brokers, Ltd. v. Continental Ins. Co.*, 728 N.Y.S.2d 769, 770 (2d Dep't 2001).

### B.    Business Income and Extra Expense Coverage

Defendant argues that Plaintiff's claims under the Business Income and Extra Expense Provisions must be dismissed because Plaintiff has not plausibly alleged any "direct physical loss of or damage to property" at its premises, as required to trigger both types of coverage. (Dkt. No.

20-13, at 14-22; Dkt. No. 37-7, at 6-12; *see also* Dkt. No. 20-2, at 136-37 (providing business income coverage for business interruptions "caused by direct physical loss of or damage to property" and extra expense coverage for expenses the insured "would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss"); *id.* at 156 (defining "Covered Cause of Loss" as "direct physical loss unless the loss is excluded or limited in this policy")). Plaintiff argues that the loss it suffered here—the interruption of its business operations as a result of the Closure Orders, which deprived it of the ability to use its property for its intended purpose—is the type of "direct physical loss of . . . property" contemplated by the Policy. (Dkt. No. 33, at 8-21).

In *Roundabout Theatre Co., Inc. v. Continental Cas. Co.,* 751 N.Y.S.2d 4 (1st Dep't. 2002), the New York Appellate Division construed insurance policy language materially similar to the language at issue here, and found that it did not provide coverage for losses a theater suffered when a street closure order temporarily prevented access to the theater following a nearby construction accident, which caused no physical damage to the theater. The court held:

> [T]he language in the instant policy clearly and unambiguously provides coverage only where the insured's property suffers direct physical damage. The Insuring Agreement provides coverage for "loss of, damage to, or destruction of property or facilities . . . contracted by the insured for use in connection with such Production, caused by the perils insured against." The Perils Insured clause covers "all risks of direct physical loss or damage to the [insured's] property," not otherwise excluded. Reading these provisions together, the only conclusion that can be drawn is that the business interruption coverage is limited to losses involving physical damage to the insured's property . . . The plain meaning of the words "direct" and "physical" narrow the scope of coverage and mandate the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy . . .

> Other provisions in the policy support the conclusion that coverage is limited to instances where the insured's property suffered direct physical damage. In the "Definition of Loss" section of the policy, the measure of recovery is limited to "such length of time as would be required with exercise of due diligence and dispatch to *rebuild, repair or replace such part of the property herein described as has been lost, damaged or destroyed* (emphasis added)." If, as [the plaintiff] argues, the policy covers losses resulting from off-site

> property damage, this provision would be meaningless since the insured obviously has no
> duty to repair a third party's property . . . An insurance policy should not be read so that
> some provisions are rendered meaningless (*see County of Columbia v. Continental Ins.
> Co.*, 83 N.Y.2d 618, 628, 612 N.Y.S.2d 345, 634 N.E.2d 946), and such would be the
> result if [the plaintiff's] position were upheld here.

*Id.* at 8-9.

Some years later, a federal district court in the Southern District of New York applied

*Roundabout* and found that a policy providing business interruption coverage in the event of

"direct physical loss or damage by a covered peril to property" did not cover a law firm's losses

that resulted when its power company preemptively shut off the firm's power as a hurricane

approached in order to preserve the integrity of the power company's electrical system in the

event of flooding. *Newman Myers Kreines Gross Harris, PC v. Great N. Ins. Co.*, 17 F. Supp. 3d

323 (S.D.N.Y. 2014). The court explained that, like the language at issue in *Roundabout*:

> The critical policy language here—"direct physical loss or damage"—similarly, and
> unambiguously, requires some form of actual, physical damage to the insured premises to
> trigger loss of business income and extra expense coverage. [The plaintiff] simply cannot
> show any such loss or damage to the 40 Wall Street Building as a result of either (1) its
> inability to access its office from October 29 to November 3, 2012, or (2) [the power
> company's] decision to shut off the power to the Bowling Green network. The words
> "direct" and "physical," which modify the phrase "loss or damage," ordinarily connote
> actual, demonstrable harm of some form to the premises itself, rather than forced closure
> of the premises for reasons exogenous to the premises themselves, or the adverse
> business consequences that flow from such closure . . . [T]he Court is unaware of
> authority supporting [the plaintiff's] argument that "direct physical loss or damage"
> should be read to include to extend to mere loss of use of a premises, where there has
> been no physical damage to such premises.

*Id.* at 331. In reaching this conclusion, the *Newman Myers* court considered out-of-state cases—

some of which are the same as or similar to cases that Plaintiff relies on here—which found

"direct physical loss or damage" where "the property at issue was rendered unusable or

unsatisfactory for its intended purpose," notwithstanding that the property at issue did not suffer

any actual structural alteration or damage. *Id.* at 329. The court explained the distinction between those cases and the case before it as follows:

> In each [case] there was some compromise to the physical integrity of the workplace. To be sure, the cases involving odors, noxious fumes, and water contamination did not involve tangible, structural damage to the architecture of the premises. But the critical policy term at issue, requiring "physical loss or damage," does not require that the physical loss or damage be tangible, structural or even visible. The invasions of noxious or toxic gases in *TRAVCO* and *Essex,* rendering the premises unusable or uninhabitable, were held to suffice, because even invisible fumes can represent a form of physical damage. The contamination of well water in *Hardinger,* similarly involved physical damage, just not structural—there, to the building's water supply. Finally, the rockfall in *Murray,* although itself not having struck the premises, revealed a palpable future risk of physical damage, from another rockfall. Whether or not these cases were each correctly decided, each involved the closure of a building due to either a physical change for the worse in the premises (*TRAVCO*, *Essex*, or *Hardinger*) or a newly discovered risk to the its physical integrity (*Murray*). Those characteristics are not presented by [the power company's] preemptive decision to shut off power to several utility service networks in order to safeguard its own system and equipment.

*Id.* at 330.

More recently, a number of New York state and federal courts have considered claims virtually identical to Plaintiff's, involving the same policy language and similar arguments to those Plaintiff makes here. Applying the principles set forth in *Roundabout* and *Newman Myers*, these courts have uniformly found that, under New York law, the loss that Plaintiff complains of—the loss of use of property for its intended, economically beneficial purpose as a result of the Closure Orders—is not the type of "direct physical loss of . . . property" the Policy contemplates. As these courts have found, this type of loss falls outside the scope of that term because it does not result from any *direct, physical* compromise to the integrity of the insured property, whether in the form of visible structural alteration or damage (as discussed in *Roundabout*) or a less tangible, but still distinctly physical, problem such as noxious gas, odor, contamination or increased risk to the property's physical integrity (as discussed in *Newman Myers*). *See, e.g., Michael Cetta, Inc. v. Admiral Indem. Co.*, No. 20-cv-4612, 2020 WL 7321405, at *5-11, 2020

U.S. Dist. LEXIS 233419, at *14-33 (S.D.N.Y. Dec. 11, 2020); *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, No. 20-cv-4471, 2020 WL 7360252, at *2-3, 2020 U.S. Dist. LEXIS 235565, at *5-10 (S.D.N.Y. Dec. 15, 2020); *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-cv-754, 2020 WL 7867553, at *3-4, 2020 U.S. Dist. LEXIS 245436, at *8-12 (W.D.N.Y. Dec. 29, 2020)[10]; *Visconti Bus Serv., LLC v. Utica Nat'l. Ins. Grp.*, No. EF005750-2020, 2021 WL 609851, at *4-10, 2021 N.Y. Misc. LEXIS 546, at *8-25 (N.Y. Sup. Ct. Feb. 12, 2021); *Soundview Cinemas Inc. v. Great Am. Ins. Grp.*, No. 605985-20, 2021 WL 561854, at *9, 2021 N.Y. Misc. LEXIS 527, at *26 (N.Y. Sup. Ct. Feb. 8, 2021); *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.*, No. 20-cv-3418, 2021 WL 860345, at *3-5, 2021 U.S. Dist. LEXIS 42828, at *7-15 (S.D.N.Y. Mar. 6, 2021); *Alexandre B. Demoura, M.D., d/b/a New York Spine Inst., Inc. v. Continental Cas. Co.*, No. 20-cv-2912, 2021 WL 848840, at *4-6, 2021 U.S. Dist. LEXIS 42384, at *11-17 (E.D.N.Y. Mar. 5, 2021); *Jeffrey M. Dressel, D.D.S., P.C. v. Hartford Ins. Co. of the Midwest, Inc.*, No. 20-cv-2777, 2021 WL 1091711, at *3-5, 2021 U.S. Dist. LEXIS 54067, at *6-13 (E.D.N.Y. Mar. 22, 2021); *Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co., Ltd.*, No. 20-cv-3350, 2021 WL 1034259, at *5-12, 2021 U.S. Dist. LEXIS 52552, at *11-31 (S.D.N.Y. Mar. 18, 2021)[11]; *but see Kingray Inc. v. Farmers Grp. Inc.*, No. 20-cv-9632, 2021 WL 837622, at *7-8, 2021 U.S. Dist. LEXIS 41300, at *17-21 (C.D. Cal. Mar. 4, 2021) (applying New York law and finding that "direct physical loss of or damage to property" language is ambiguous and could include a beauty salon's temporary dispossession of its property due to New York's Closure

---

[10] *Tappo of Buffalo* was a magistrate judge's report and recommendation which the district judge never reviewed because the case was transferred to the Western District of Pennsylvania for consolidation of pretrial proceedings pursuant to 28 U.S.C. § 1407. Conditional Transfer Order, *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-cv-754 (Jan. 20, 2021), ECF No. 22.

[11] *Sharde Harvey* was a magistrate judge's report and recommendation which is pending review by the district judge.

Orders, but not addressing the applicability of *Roundabout, Newman Myers*, or any of the foregoing COVID-19 cases).[12]

Plaintiff's claim is on all fours with the foregoing case law from state and federal courts in New York. The Policy's Business Income and Extra Expense Provisions use the precise language that courts applying New York law have consistently held unambiguously does not cover mere "loss of use" that is unconnected to any physical damage, alteration or compromise to the insured property. As the *Roundabout* court and courts following it have explained, the qualifiers "direct" and "physical" make clear that the "loss of . . . property" contemplated by the Policy is restricted to losses that are *direct* and *physical* in nature, and does not include "forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure." *Newman Myers*, 17 F. Supp. 3d at 331.

Moreover, as in the foregoing cases, the Policy as a whole supports this interpretation. Specifically, the Policy contains a definition of "period of restoration" materially similar to the one discussed by the *Roundabout* court, (Dkt. No. 20-2, at 144), which New York courts have commonly found "suggests [that the 'direct physical loss of or damage to property' covered by the Policy refers to] the occurrence of material harm that then requires a physical fix." *Michael Cetta, Inc.*, 2020 WL 7321405, at *6, 2020 U.S. Dist. LEXIS 233419, at *19-21 (citing *Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005)); *see also Newman*

---

[12] Plaintiff does not allege that its property ever actually became contaminated with COVID-19 or that it suffered any business losses as a result, and therefore the Court need not consider whether such allegations would be sufficient to plead a "direct physical loss of or damage to property" as contemplated by the Policy. The Court notes, however, that courts applying New York law to have considered the issue appear to agree that "an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical,'" and that "[t]herefore, 'even assuming that the virus physically attached to covered property,' . . . 'it did not constitute the direct, physical loss or damage required to trigger coverage because it's [sic] presence can be eliminated' by 'routine cleaning and disinfecting.'" *Tappo*, 2020 WL 7867553, at *4, 2020 U.S. Dist. LEXIS 245436, at *11 (citations omitted); *Visconti*, 2021 WL 609851, at *10, 2021 N.Y. Misc. LEXIS 546, at *25; *Food for Thought*, 2021 WL 860345, at *5, 2021 U.S. Dist. LEXIS 42828, at *12-14; *Jeffrey M. Dressel*, 2021 WL 1091711, at *4, 2021 U.S. Dist. LEXIS 54067, at *11-12; *Sharde Harvey*, 2021 WL 1034259, at *9-11, 2021 U.S. Dist. LEXIS 52552, at *28-29.

*Myers*, 17 F. Supp. 3d at 332 ("The words 'repair' and 'replace' contemplate physical damage to

the insured premises as opposed to loss of use of it"); *Alexandre B. Demoura*, 2021 WL 848840,

at *5, 2021 U.S. Dist. LEXIS 42384, at *13-14 ("Because something must first be physically

damaged in order to be 'restore[d] to a sound or good condition' or 'fix[ed]' it follows from the

plain language of the Policy that 'physical loss of or damage to' requires a change to the real,

tangible property at issue for coverage to apply.") (alterations in original).[13] Therefore, the Court

follows the persuasive analysis of virtually every New York state and federal court to consider

this issue, and joins these courts in finding that the Policy's Business Income and Extra Expense

Provisions do not provide coverage for Plaintiff's "loss of use" of its property resulting from the

Closure Orders.

Perhaps recognizing that the policy language it relies on is not meaningfully

distinguishable from the language analyzed in *Roundabout* and its progeny, Plaintiff's primary

argument is that these cases were incorrectly decided (and that the Court therefore should not

follow them) because they read "loss" and "damage" to have the same meaning, in violation of

the "well-settled principles" that "policies should not be interpreted to make words meaningless"

and that "words separated by the conjunctive 'or' are to be interpreted as separate things." (Dkt.

No. 33, at 8-13). As an initial matter, this Court is "bound to apply the law as interpreted by New

---

[13] Plaintiff points out—correctly—that the "period of restoration" is simply a time period that "addresses the measure of the insured's losses, not whether the insured suffered 'direct physical loss or damage' in the first instance." (Dkt. No. 33, at 20-21). Plaintiff also argues that "[h]ad [Defendant] intended 'loss' to require physical alteration of the property, it should have written a definition for 'physical loss' into the policy to say that, not slipped a definition or qualification upon 'loss' through the back door in the definition of a separate term in the policy." (*Id.* at 21). Plaintiff's arguments miss the mark. The phrase "direct physical loss of or damage to property" unambiguously excludes the losses Plaintiff complains of here even without considering the "period of restoration" definition, because those losses are simply not "direct physical" losses within the ordinary meaning of that phrase. The "period of restoration" definition thus does not render an otherwise ambiguous phrase unambiguous by "slipp[ing] a definition or qualification upon 'loss' through the back door"; rather, when viewed together with the language limiting coverage to "direct physical loss of or damage to property," it merely further demonstrates that the Policy as a whole contemplates coverage only for losses that are *physical* in nature.

York's intermediate appellate courts" unless there is "persuasive authority that the New York Court of Appeals . . . would reach a different conclusion." *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999).

Plaintiff has pointed to no such persuasive authority. Its contention that *Roundabout* and its progeny violate New York Court of Appeals law by construing "loss" and "damage" to have the same meaning is wrong. In fact, the *Roundabout* court itself addressed this very argument, and explained that its interpretation of "loss of" as excluding "loss of use" did not render any other word in the phrase "loss of, damage to, or destruction of" superfluous, because "'loss of' could refer to the theft or misplacement of theatre property that is neither damaged nor destroyed, yet still" causes business interruption. *Roundabout*, 751 N.Y.S.2d at 8. Other courts addressing this argument in the COVID-19 context have observed that interpreting "loss of" to exclude "loss of use" does not render any word in the phrase "direct physical loss of or damage to property" superfluous, because "'loss' would extend to the *complete* destruction of property, whereas 'damage' contemplates a lesser injury." *Michael Cetta*, 2020 WL 7321405, at *9, 2020 U.S. Dist. LEXIS 233419, at *27; *see also, e.g., Food for Thought*, 2021 WL 860345, at *4, 2021 U.S. Dist. LEXIS 42828, at *11; *Jeffrey M. Dressel*, 2021 WL 1091711, at *4, 2021 U.S. Dist. LEXIS 54067, at *9-10. Thus, a conclusion that the phrase "direct physical loss of . . . property" unambiguously excludes the type of "loss of use" Plaintiff experienced here is entirely consistent with the insurance-policy-interpretation principles that the New York Court of Appeals has adopted and that Plaintiff relies on.

Plaintiff also points to a handful of cases from other jurisdictions in support of its claim that the phrase "direct physical loss of or damage to property" (or similar language) is at least ambiguous as to whether it includes the kind of "loss of use" Plaintiff has suffered, requiring the

Court to construe the ambiguous policy in favor of the insured at the motion to dismiss stage.[14]

These cases are simply inapposite; each one applied the law of a state other than New York and

found that, *under the applicable state law as interpreted by that state's courts*, it was at least

possible to construe the language relied on as including such "loss of use." *See, e.g., Studio 417,*

*Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800-03 (W.D. Mo. 2020); *Cherokee Nation v.*

*Lexington Ins. Co.*, No. 20-cv-150, 2021 WL 506271, at *3-9[15] (Okla. Dist. Ct. Jan. 28, 2021);

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-265, 2020 WL 7249624, at

*7-10, 2020 U.S. Dist. LEXIS 231935, at *18-28 (E.D. Va. Dec. 9, 2020); *North State Deli, LLC*

*v. The Cincinnati Ins. Co.*, No. 20-cv-02569, 2020 WL 6281507, at *3-4, 2020 N.C. Super.

LEXIS 38, at *5-10 (N.C. Super. Ct. Oct. 9, 2020); *Henderson Rd. Rest. Sys., Inc. v. Zurich Am.*

*Ins. Co.*, No. 20-cv-1239, 2021 WL 168422, at *10-13, 2021 U.S. Dist. LEXIS 9521, at *26-38

(N.D. Ohio Jan. 19, 2021); *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, No. 20-cv-2806,

2021 WL 767617, at *3-5, 2021 U.S. Dist. LEXIS 37096, at *9-14 (N.D. Ill. Fe. 28, 2021); *In re*

*Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2964, 2021 WL 679109,

at *8-10, 2021 U.S. Dist. LEXIS 32351, at *37-42 (N.D. Ill Feb. 22, 2021). By contrast, *New*

*York* law since *Roundabout* has been clear and consistent in holding that, whatever ambiguity

may exist in the precise meaning of the phrase "direct physical loss of or damage to property,"

---

[14] Notably, the cases Plaintiff points to represent a minority of COVID-19 business interruption cases that have been adjudicated across the country. Indeed, Defendant has pointed the Court to a much larger number of cases finding in the *insurer's* favor on claims involving the same or similar policy language. (Dkt. No. 20-13, at 17-22; Dkt. No. 37-7, at 8-10 & n.1-2; Dkt. No. 41). Many of these cases construe language identical to that at issue here, while others involve somewhat different policy language or are otherwise factually distinguishable. (Dkt. No. 33, at 15-20 (arguing that some of the cases Defendant relies on are distinguishable and inapposite); Dkt. No. 44, at 6-17 (same)). In any event, as with the out-of-state cases Plaintiff cites, the cases all apply the law of states other than New York, and are thus of limited value to the Court's task of applying New York law to interpret the Policy's language. Nonetheless, viewed collectively, these cases demonstrate that the Court's decision on this issue is not only firmly in line with the near-unanimous weight of New York authority, but is also consistent with the majority view expressed by courts considering the same question under other states' laws.

[15] No parallel LEXIS citation available.

that phrase unambiguously *cannot* refer to mere "loss of use" that is unconnected to any direct, physical compromise of Plaintiff's property.[16]

Because the Court finds that the Policy's Business Income and Extra Expense Provisions unambiguously do not provide coverage for the losses Plaintiff complains of here, and that Defendant's denial of such coverage therefore does not constitute a breach of the Policy, Plaintiff's claims for declaratory relief (Counts I and III) and anticipatory breach of contract (Counts II and IV) under these provisions must be dismissed.

### C.  Civil Authority Coverage

Defendant also argues that Plaintiff's claims under the Civil Authority Provision must be dismissed because Plaintiff has not plausibly alleged any of the "core elements" required to trigger coverage under that provision, namely that: (1) an action of a civil authority "prohibits access" to the insured premises; (2) the action of that civil authority was issued as a result of "damage" to property not more than one mile from the insured premises caused by a Covered Cause of Loss (which, as noted previously, the Policy defines as a "direct physical loss"); and (3) the action of the civil authority was "taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or . . . to enable a civil authority to have unimpeded access to the damaged property." (Dkt. No. 20-13, at 22-26; Dkt. No. 37-7, at 12; *see also* Dkt. No. 1, ¶ 38; Dkt. No. 20-2, at 137). Plaintiff does not meaningfully respond to Defendant's substantive arguments, other than to state that, "putting

---

[16] Some of the out-of-state cases Plaintiff cites are also distinguishable on other grounds. For example, in *Studio 417*, in finding that the plaintiff had suffered a direct, physical loss, the court relied heavily on allegations that COVID-19 had actually entered and contaminated the plaintiff's property. *See Studio 417*, 478 F. Supp. 3d at 800-03. There are no such allegations here, and even if there were, as previously discussed, it is doubtful that such allegations would be sufficient to survive a motion to dismiss under New York law. *See* n.12 *supra*. As another example, in *Cherokee Nation*, the policy language at issue was different, and broader than, the language at issue here, as the court expressly recognized. *See Cherokee Nation*, 2021 WL 506271, at *8.

aside that it would be improper on a Rule 12(b)(6) motion to find as a matter of law that no business in the proximity of Plaintiff's business suffered a physical loss of or damage to their properties, if the Closure Orders caused physical loss of Plaintiff's property, they likewise caused physical loss to property in the vicinity of Plaintiff's property." (Dkt. No. 33, at 21).[17] Moreover, at oral argument, Plaintiff's counsel appeared to abandon Plaintiff's argument that its losses are covered by the Civil Authority Provision, conceding that the New York Closure Order it was subject to did not "prohibit access" to its property, as required to trigger coverage.

Plaintiff's complaint refers in general terms to "stay-at-home" and "shelter-in-place" orders issued by civil authorities nationwide that have "suspend[ed] or severely curtail[ed] business operations of non-essential businesses," including by "clos[ing] restaurants and bars for services other than take-out and delivery," and alleges that "[a]s a result of the Closure Orders . . . [Plaintiff's business] had to cease operations." (Dkt. No. 1, ¶¶ 3-4, 15, 30-31, 45). But Plaintiff fails to point to any specific Closure Order that forced it to shut down its business or curtail its activities, much less allege that the relevant Closure Order met the particular requirements for coverage under the Civil Authority Provision. For this reason alone, Plaintiff's complaint falls far short of stating a claim for coverage under the Civil Authority Provision.

Even if the Court were to consider the New York Closure Order—which is the only Closure Order the parties discuss in their briefing or present any record evidence of—that order alone would not provide a basis for coverage under the Civil Authority Provision. By its plain terms, the New York Closure Order allowed Plaintiff's operations to remain open for hotel, take-

---

[17] Plaintiff devotes the remainder of the Civil Authority Provision section of its opposition brief to an argument that the cause of Plaintiff's Business Income and Extra Expenses losses was the Closure Orders, not coronavirus. (Dkt. No. 33, at 22). This argument has little relevance to the question of whether Plaintiff's losses are covered under the Civil Authority Provision; rather, it seems primarily geared toward Defendant's separate argument that the Virus Exclusion bars coverage for Plaintiff's losses.

out and delivery services, while specifically exempting those services from the capacity

reduction requirements applied to businesses deemed "non-essential." As Plaintiff conceded at

oral argument, under New York law, because the New York Closure Order did not completely

deny access to Plaintiff's property, but merely restricted its use, it did not "prohibit access"

within the meaning of the Civil Authority Provision. *See, e.g., Michael Cetta, Inc.*, 2020 WL

7321405, at *12-13, 2020 U.S. Dist. LEXIS 233419, at *35-39; *Food for Thought*, 2021 WL

860345, at *6, 2021 U.S. Dist. LEXIS 42828, at *15-17; *Sharde Harvey*, 2021 WL 1034259, at

*13-14, 2021 U.S. Dist. LEXIS 52552, at *34-36.

Furthermore, Plaintiff's complaint speaks in generalities about the spread of COVID-19

and its impact on the business community, while failing to point to any damage to a specific

property within a mile of Plaintiff's business that gave rise to the New York Closure Order.

"Without specific allegations that a neighboring property suffered 'damage to property,' the

Complaint fails to state a claim that is plausible on its [face] as to [Plaintiff's] entitlement to civil

authority coverage." *Visconti*, 2021 WL 609851, at *12, 2021 N.Y. Misc. LEXIS 546, at *29

(quoting *Michael Cetta, Inc.*, 2020 WL 7321405, at *11, 2020 U.S. Dist. LEXIS 233419, at

*35)); *Food for Thought*, 2021 WL 860345, at *7, 2021 U.S. Dist. LEXIS 42828, at *18

("[G]eneralized statements [regarding widespread COVID-19 infections causing property loss

and damage] cannot serve as a substitute for a specific allegation that any property near the

insured's premises was in fact damaged."); *Sharde Harvey*, 2021 WL 1034259, at *14, 2021

U.S. Dist. LEXIS 52552, at *36-37 (finding that a complaint failed to plausibly state a claim for

coverage under a civil authority provision where it did "not name any specific business 'in the

immediate area' that reported a case of COVID-19, let alone one that led to the government

shutdown orders").

Finally, even assuming Plaintiff had alleged (or could allege) such damage to a neighboring property, the complaint fails to allege that the New York Closure Order was issued "in response to dangerous physical conditions resulting from the damage or continuation of" such damage, or "to enable a civil authority to have unimpeded access to the damaged property." (Dkt. No. 1, ¶ 38; Dkt. No. 20-2, at 137). To the contrary, the language of the New York Closure Order makes clear that it was issued "in order to facilitate the most timely and effective response to the COVID-19 emergency disaster" following "travel-related cases and community contact transmission of COVID-19 [that] have been documented in New York State and are expected to . . . continue," not because of any damage to a specific property near Plaintiff's business. (Dkt. No. 20-9, at 2).

Such an order, issued in response to the spread of COVID-19 throughout New York State with the goal of limiting future transmission of the virus statewide, does not fall within the scope of the Civil Authority Provision under New York law. *See, e.g., United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 134-35 & n.8 (2d Cir. 2006) (applying New York law and finding that a Washington, D.C. airport's temporary closure following the September 11, 2001 terrorist attack on the Pentagon was "caused by fears of future attacks, not by the actual physical damage inflicted on the Pentagon" and therefore did not trigger civil authority coverage); *10012 Holdings*, 2020 WL 7360252, at *4, 2020 U.S. Dist. LEXIS 235565, at *11 ("[T]he Complaint does not plausibly allege that the potential presence of COVID-19 in neighboring properties directly resulted in the closure of Plaintiff's properties; rather, it alleges that closure was the direct result of the risk of COVID-19 at Plaintiff's property"); *Visconti*, 2021 WL 609851, at *12, 2021 N.Y. Misc. LEXIS 546, at *29-31 ("[E]ven if Covid-19 contamination in other buildings were deemed to constitute direct physical loss of or damage to property, that was not

22

the cause of any restriction imposed by civil authority upon the use of [the plaintiff's] own premises"; rather, "*both* premises are restricted for the same reason: to limit the risk of spreading the Covid-19 virus," which "simply does not implicate Civil Authority coverage"); *Food for Thought*, 2021 WL 860345, at *6, 2021 U.S. Dist. LEXIS 42828, at *17-18 (discussing the foregoing cases and reaching a similar conclusion); *Sharde Harvey*, 2021 WL 1034259, at *14, 2021 U.S. Dist. LEXIS 52552, at *37-38 (same).

Finally, even assuming Plaintiff could allege that damage to a nearby property gave rise to the New York Closure Order, Plaintiff has not plausibly alleged that such damage resulted from a Covered Cause of Loss as defined in the Policy. Obviously, "loss of use" of property that neighboring businesses suffered as a result of the New York Closure Order (or any other Closure Order) cannot itself be such a "Covered Cause of Loss"; not only would such a conclusion be nonsensical, but for the reasons explained in Section IV.B *supra*, such a loss does not constitute a "direct physical loss," and therefore cannot be a "Covered Cause of Loss" within the meaning of the Policy. And even assuming Plaintiff could plausibly allege that the New York Closure Order arose from actual COVID-19 contamination at a specific nearby property, under New York law, it is doubtful that such a contamination would constitute a "direct physical loss," and thus a "Covered Cause of Loss," under the Policy. *Visconti*, 2021 WL 609851, at *12, 2021 N.Y. Misc. LEXIS 546, at *29 ("[E]ven if, as [the plaintiff] alleges, buildings throughout New York have been contaminated by Covid-19, that would not constitute the 'direct physical loss of or damage to' property that is required to trigger coverage." (citing *Tappo*, 2020 WL 7867553, at *4, 2020 U.S. Dist. LEXIS 245436, at *11-12)); *Food for Thought*, 2021 WL 860345, at *7, 2021 U.S. Dist. LEXIS 42828, at *19 (finding that "[c]ontamination by a virus does not

constitute a 'direct physical loss' that is required to trigger coverage" under a similar civil authority provision).

Because the Court finds that the Policy's Civil Authority Provision unambiguously does not provide coverage for the losses Plaintiff complains of here, and that Defendant's denial of such coverage therefore does not constitute a breach of the Policy, Plaintiff's claims for declaratory relief (Count V) and anticipatory breach of contract (Counts VI) under this provision must be dismissed.

### D.     Exclusions

The parties also present arguments as to whether, assuming the losses Plaintiff complains of are insured under the Policy, coverage is nonetheless barred by the Policy's Virus Exclusion or other exclusions in the Policy. (Dkt. No. 20-13, at 26-31; Dkt. No. 33, at 22-30; Dkt. No. 37-7, at 12-15). "These exclusions only apply if entitlement to coverage under one of the Policy's provisions is first established," and therefore, "[b]ecause the Court concludes that [Plaintiff] fails to establish entitlement to coverage under the Policy, it need not reach the question of whether these various exclusions would apply." *Michael Cetta, Inc.*, 2020 WL 7321405, at *13 n.5, 2020 U.S. Dist. LEXIS 233419, at *39 n.5; *see also, e.g., Visconti*, 2021 WL 609851, at *13, 2021 N.Y. Misc. LEXIS 546, at *34 ("Since the Court has determined that there is no coverage under the [insurance policy] in the first instance, the interpretation of the virus exclusion may await another day."); *Alexandre B. Demoura*, 2021 WL 848840, at *7, 2021 U.S. Dist. LEXIS 42384, at *19-20 ("Because Plaintiff has failed to state a claim for relief under the provisions discussed above, the question of whether the Policy contains an exclusion for losses caused by virus or pandemic is moot.").

E.        **Dismissal of Plaintiff's Complaint with Prejudice**

Because the Court has found that all of Plaintiff's individual claims for damages and declaratory relief must be dismissed, Plaintiff's class claims must be dismissed as well. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) ("Courts in this circuit have repeatedly held that, '[i]n order to maintain a class action, Plaintiffs must first establish that they have a valid claim . . . If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim.'") (citation omitted). Therefore, Plaintiff's complaint must be dismissed in its entirety.

Plaintiff has not requested leave to amend its complaint. In any event, the Court finds that any amendment would be futile, as based on the Policy's plain language and the legal principles reviewed throughout this Decision, the Policy unambiguously does not cover Plaintiff's losses, and it does not appear that Plaintiff could plead any set of facts that would give rise to a plausible claim for the relief it seeks. Therefore, the Court dismisses Plaintiff's complaint with prejudice. *See, e.g., Michael Cetta, Inc.*, 2020 WL 7321405, at *13, 2020 U.S. Dist. LEXIS 233419, at *40 (dismissing complaint with prejudice where the plaintiff "did not move this Court for leave to amend the Complaint, and, in all events, the Court finds that allowing leave to amend would be futile"); *10012 Holdings*, 2020 WL 7360252, at *4, 2020 U.S. Dist. LEXIS 235565, at *13 ("Leave to amend is denied because the Policy does not provide coverage for the loss Plaintiff suffered."); *Jeffrey M. Dressel*, 2021 WL 1091711, at *5, 2021 U.S. Dist. LEXIS 54067, at *15 (dismissing complaint with prejudice where "any amendment to the complaint would be futile" because "[u]nder the clear and unambiguous language of the Policy, Plaintiff cannot state a claim for relief").

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss Plaintiff's complaint pursuant to Fed. R.

Civ. P. 12(b)(6) (Dkt. No. 20) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED with prejudice** in its

entirety.

**IT IS SO ORDERED.**

Dated:  May 24, 2021
              Syracuse, New York

Brenda K. Sannes
U.S. District Judge